2009 UT App 305

**In the Matter of the George Fisher Jr. Family Inter Vivos Revocable Trust.**

**Kim FISHER, Michael Fisher, and Susan Thacker, Petitioners, Appellants, and Cross-appellees,**

v.

**Brent FISHER, Trustee, Appellee, and Cross-appellant.**

No. 20080389–CA.

Court of Appeals of Utah.

Oct. 22, 2009.

Rehearing Denied Nov. 17, 2009.

---

Charles M. Bennett, Salt Lake City, for Appellants and Cross-appellees.

Benson L. Hathaway, Thomas A. Mecham, and Christopher S. Hill, Salt Lake City, for Appellee and Cross-appellant.

Before Judges GREENWOOD, DAVIS, and THORNE.

## OPINION

DAVIS, Judge:

¶ 1 Petitioners Kim Fisher and Michael Fisher appeal the trial court's judgment, arguing that the court incorrectly calculated damages and erred in failing to award them attorney fees. Respondent Brent Fisher appeals the same judgment, arguing that the trial court erred in awarding prejudgment interest and failing to grant him an award of attorney fees. We affirm in part and reverse in part. This opinion is the opinion of the court with respect to all issues except for the issues of Respondent's entitlement to attorney fees, see infra Part III.B, and whether we should address the limitation of liability clause, see infra Part IV.A. As to those two issues, the concurring/dissenting opinion constitutes the opinion of the court.

## BACKGROUND

¶ 2 George Fisher Jr. and his wife, LaRue Fisher, executed the George Fisher Jr. Family Inter Vivos Revocable Trust Agreement (the trust) in 1975. Around this same time, Respondent, who is George and LaRue's son, began to manage the family farm and ranch, conducting his own cattle operations on the ranch in exchange for his payment of the ranch expenses.

¶ 3 After George died on April 18, 1992, LaRue and Respondent became co-trustees of the trust. According to the trust terms, the trust was divided into a marital trust and a family trust, each of which held a portion of the assets George had owned at death. In late 1992, an appraiser was hired to value the trust property. Thereafter, on May 8, 1995, LaRue and Respondent, as co-trustees, executed an allocation, dividing the trust properties between the marital and family trusts.[1] The allocation listed fifty head of cattle as belonging to the trust and valued those cattle at $42,000. An updated appraisal was later performed in February 1997, and this later appraisal included "some 100" cattle, with values from $450–$650 each, depending on age.

¶ 4 Respondent continued to manage the ranch and farm following George's death and continued his own cattle operations thereon. Respondent also continued to pay trust expenses, including property taxes and water assessments. At some point, Kim Fisher, Michael Fisher, and Susan Thatcher, who are Respondent's siblings as well as the other beneficiaries of the family trust, were unhappy with Respondent's administration of the trust. Accordingly, LaRue and the four siblings executed a designation of trustees on February 21, 2001, naming each of themselves as a co-trustee of the trust. Shortly thereafter, the siblings agreed on a distribution of the real property of the trust. But when they could not agree on the distribution of the trust's other assets, Kim, Michael, and Susan filed a petition for recovery of assets that they alleged had been lost or taken by Respondent.[2]

¶ 5 The trial court eventually determined that fifty head of cattle, valued at $550 a head, were part of the trust and had been converted by Respondent. The trial court also determined that Respondent owed unpaid rent for use of the ranch, but the court deducted from that amount the property taxes and water assessments Respondent had

---

1. Although the trust was split into two separate trusts, this fact is not important for purposes of the issues on appeal, and thus, our references to "the trust" simply refer to the original trust created by George and LaRue.

2. Although Susan joined the petition, she ultimately declined to participate in the legal proceedings.

paid on the trust's real property. The trial court also awarded prejudgment interest to Petitioners. Petitioners now appeal the judgment of the trial court, and Respondent cross-appeals.

ISSUES AND STANDARDS OF REVIEW

¶ 6 Petitioners first contest the trial court's factual findings regarding the timing of Respondent's conversion of cattle and regarding the number and value of cattle converted. We will not set aside such findings "unless clearly erroneous." Utah R. Civ. P. 52(a). " 'A finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' " *State v. Walker*, 743 P.2d 191, 193 (Utah 1987) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948)).

¶ 7 Petitioners also argue that the trial court erred by giving Respondent a credit for his payment of property taxes and water assessments on the trust property. Whether such an offset is allowed under this cause of action and whether the trial court placed the burden of proof on the appropriate party are questions of law, which we review for correctness. *See Martinez v. Media–Paymaster Plus/Church of Jesus Christ of Latter-Day Saints*, 2007 UT 42, ¶ 41, 164 P.3d 384 ("Burden of proof questions typically present issues of law that an appellate court reviews for correctness."); *Scott v. Majors*, 1999 UT App 139, ¶ 8, 980 P.2d 214 ("We give the trial court's legal conclusions no deference and review them for correctness.").

¶ 8 Both Petitioners and Respondent challenge the trial court's decision declining to award attorney fees. "[T]he appropriate standard for reviewing equitable awards of attorney fees is abuse of discretion." *Hughes v. Cafferty*, 2004 UT 22, ¶ 20, 89 P.3d 148. However, we give no deference to the trial court's determination as to whether attorney fees were allowed under a statute. *See Still Standing Stable, LLC v. Allen*, 2005 UT 46, ¶ 8, 122 P.3d 556 ("Whether the

trial court properly interpreted the legal prerequisites for awarding attorney fees under [a statute] is a question of law that we review ... for correctness." (omission in original) (internal quotation marks omitted)).

¶ 9 Finally, Respondent challenges the trial court's award of prejudgment interest. Whether trust language precludes such an award is a question of law, reviewed for correctness. *See Lakeside Lumber Prods., Inc. v. Evans*, 2005 UT App 87, ¶ 8, 110 P.3d 154 ("[A] district court's interpretation of a trust instrument is a question of law, which we review for correctness." (internal quotation marks omitted)). And if the trust language does not preclude an award of prejudgment interest, we review for correctness the trial court's decision that the award was otherwise allowable. *See Cornia v. Wilcox*, 898 P.2d 1379, 1387 (Utah 1995) ("A trial court's decision to grant or deny prejudgment interest presents a question of law which we review for correctness.").

ANALYSIS

I. Conversion of the Cattle

A. Date of Conversion

¶ 10 Petitioners argue that the trial court erred in using the date that the trust allocation was signed—May 8, 1995—as the conversion date of the cattle. But the finding to which Petitioners point contains no such determination. Instead, the finding simply determines that the cattle were part of the trust as of May 8, 1995. The trial court clarified in a later ruling that this finding "did not resolve the issue as to when the cattle were converted." The trial court elaborated as follows:

> [T]here was no evidence to establish a specific date for the conversion of cattle or for any single cow. The Court would have to speculate to fix a date for the actual conversion of the cattle. The cows may have been converted or the proceeds converted on May 08, 1995, or at any time after May 08, 1995. Moreover, ... it is likely that the cows were disposed of over a period of years. In any event, the parties failed to present any evidence as to the

date of conversion. Therefore, the Court cannot fix a date upon which the damage occurred.

Thus, the trial court did not find any specific date as the date of conversion of the cattle.

■ ¶ 11 Petitioners argue, without citation to legal authority, that the conversion date should be the date of George's death—April 18, 1992—because Respondent did not account for any cattle in the 2004 accounting he prepared in connection with these proceedings and because Respondent testified that there were no cattle in the trust at the time of George's death. But we do not see that either of these facts establish a date of conversion. Respondent's failure to include the cattle in his 2004 accounting simply indicates, at most, that conversion occurred before the date the accounting was prepared. And Respondent's argument that there were never any cattle in the trust does nothing to establish any specific date of conversion.

¶ 12 Petitioners also rely on the fact that the May 8, 1995 allocation, which the trial court found to be convincing proof of the existence of the cattle, arguably attests to what property belonged to the trust at the time of George's death in 1992 as opposed to what property belonged to the trust when the allocation was signed three years later. But even assuming that such is the case, this does nothing to pinpoint the time at which conversion occurred; indeed, such an assumption makes the time of conversion less definite, that is, not only could conversion have occurred sometime after May 8, 1995, conversion could also have occurred sometime after April 18, 1992 and before May 8, 1995.[3] Thus, Petitioners point to no evidence

indicating when any of the cattle were converted, and we do not see that the trial court clearly erred in its determination that there was no evidence from which a date of conversion could be established.

B. Number of Cattle

■ ¶ 13 The trial court relied on the 1995 allocation to determine that fifty head of cattle were converted from the trust. Petitioners argue that the trial court should have instead relied on the 1997 appraisal and determined that one hundred head of cattle were converted. We cannot say that the trial court's finding on this matter was clearly erroneous where (1) the 1995 allocation was closer in time to George's death than was the 1997 appraisal; (2) Respondent, who actually worked on the ranch with the cattle, signed the 1995 allocation, which attests that the trust owned fifty head of cattle; (3) there was no evidence that the preparer of the 1997 appraisal had ever observed or counted the cattle;[4] (4) the 1997 appraisal says that it is based on a 1992 appraisal that was never entered into evidence; (5) there was testimony that the 1992 appraisal indicated that there were "50 something" head of cattle in the trust;[5] and (6) the 1995 allocation, which was closer in time to and apparently based on the 1992 appraisal, listed approximately fifty head of cattle.

■ ¶ 14 Petitioners' main complaint regarding the trial court's finding appears to be that the evidence upon which the court relied was not persuasive in light of (1) Respondent's later claim that there were really no cattle in the trust[6] and (2) the fact that

---

3. Petitioners seem to be advocating a rule wherein if no conversion date can be determined based on the evidence, we default to the earliest possible date of conversion. Petitioners provide no legal authority supporting such a sweeping rule, and we decline to adopt the same.

4. Although Respondent's testimony suggested that the person conducting the appraisals was physically present on the ranch when making the 1992 appraisal, there is no evidence that this person actually counted the cattle at that time.

5. Petitioners incorrectly assume that because the 1997 appraisal referenced the 1992 appraisal for further description of the properties evaluated,

this "establishes that" the 1992 appraisal listed one hundred head of cattle.

6. Respondent repeatedly testified that there were no cattle in the trust when George died. Petitioners argue that because Respondent essentially admitted the 1995 allocation was unreliable, he should be held to such testimony. Petitioners are correct that "[o]rdinarily the court will hold a party responsible for the unfavorable aspects of the testimony he presents." *Ray v. Consolidated Freightways,* 4 Utah 2d 137, 289 P.2d 196, 201 (1955). We do not, however, agree that Respondent's testimony—that he made a mistake on the 1995 allocation and that there really were no cattle in the trust as of George's death—means

the 1997 appraisal, having been made by a disinterested party, was "untainted" and more persuasive, especially considering that Respondent did not object to the appraisal's contents being used during a family meeting.[7] We may not, however, address such an argument regarding the weight of the evidence because weighing the evidence is the responsibility of the trial court, and we therefore owe deference to the trial court's decision in this regard. *See In re Estate of Bartell,* 776 P.2d 885, 886 (Utah 1989) ("Whether the facts have been found by a jury or a judge, appellants should recognize that the burden of overturning factual findings is a heavy one, reflective of the fact that we do not sit to retry cases submitted on disputed facts."); *State v. Walker,* 743 P.2d 191, 193 (Utah 1987) ("The appellate court .... does not consider and weigh the evidence de novo. The mere fact that on the same evidence the appellate court might have reached a different result does not justify it in setting the findings aside." (omission in original) (internal quotation marks omitted)); *State v. Anderton,* 668 P.2d 1258, 1263 (Utah 1983) ("It lies within the prerogative of the trial court to weigh the evidence and determine the credibility of the witnesses, and [an appellate court] should not substitute its judgment for that of the trial court on issues of fact that are supported by substantial, credible and admissible evidence.").

## C. Value of the Cattle

¶ 15 In somewhat of an about-face, Petitioners next argue that the trial court should have relied on the 1995 allocation and not the 1997 appraisal to determine the value of the cattle. We see no clear error in the trial court's determination, considering that

the 1997 appraisal was the more detailed of the documents in this regard: the 1995 allocation simply set forth a single total dollar amount, while the 1997 appraisal specifically calculated a dollar amount based on the varying values of different age groups of cattle. We also recognize that the 1997 appraisal was closer in time to when conversion occurred—sometime on or after May 8, 1995—than was the 1992 appraisal upon which the 1995 allocation was based. Further, we do not agree with Petitioners that the trial court's determination that most, if not all, of the converted cattle were older meant that an agreement between Respondent and George continued after George died. The trial court simply determined that because the agreement was in place *before* George died, only older cattle would have been part of the trust upon George's death.

## II. Credit for Payment of Property Taxes and Water Assessments

¶ 16 Petitioners argue that the trial court erred by granting Respondent a credit for property taxes and water assessments that he had paid. But " 'a trustee is entitled to reimbursement for all expenses properly incurred in discharging the responsibilities of his trust.' " *Sundquist v. Sundquist,* 639 P.2d 181, 188 (Utah 1981) (quoting *Walker v. Walker,* 17 Utah 2d 53, 404 P.2d 253, 258 (1965)); *see also* Restatement (Second) of Trusts § 244 (1959) ("The trustee is entitled to indemnity out of the trust estate for expenses properly incurred by him in the administration of the trust."). And we see no error in the trial court's determination that paying property taxes and water assessments is an obligation of the property owner,

---

that the trial court was in any way precluded from relying on the 1995 allocation and had no choice but to rely on the 1997 appraisal for the number of cattle converted. Indeed, the trial court may not have even believed Respondent's testimony regarding the 1995 allocation. *See generally id.* at 201 ("If the testimony seemed so wholly unreasonable to the judge in the light of his own knowledge and experience that he deemed it incredible, it was not imperative that he abandon common sense and believe it....").

7. Petitioners state that there is no evidence to marshal in support of the trial court's finding. They appear to be operating under the incorrect

assumption that if evidence is less than credible, then there is no supporting evidence. Considering that the trial court specifically stated the evidence on which its reliance was placed, Petitioners contention that there was no evidence supporting the finding is clearly incorrect. Further, in addition to the 1995 allocation, there was testimony by Respondent that the 1992 appraisal showed that about fifty head of cattle were part of the trust. In their reply brief, Petitioners acknowledge both of these pieces of evidence but argue that such evidence is less credible than the evidence in their favor.

i.e., the trust, and not of the renter.[8]  Further, we do not see how the restatement cited by Petitioners in support of their argument excepts the situation here from the general rule that a trustee is entitled to payments made in discharging the trust's obligations.[9]

¶17 We are also not persuaded by Petitioners' argument that because the trial court relied on the 2004 accounting it was placing on Petitioners the burden to establish if the payments were not made as reported by Respondent.  They argue that, instead, it was Respondent's responsibility to present more reliable evidence to merit a credit for the payments.  We do not see that Petitioners ever objected below to the reliability or adequacy of the evidence produced as to the amount of property tax and water assessments Respondent paid.  Although Petitioners are correct that Respondent had a duty to account and keep accurate records, we do not see that Petitioners ever adequately raised the issue of failure to do so before the trial court.  And where his records were inadequate, Respondent did not receive a credit for amounts allegedly paid.  Accordingly, the trial court appropriately placed the burden on Respondent to establish the amount and existence of payments made for the benefit of the trust.

### III.   Attorney Fees

#### A.   Equitable Award of Attorney Fees

¶18 Petitioners essentially argue that when the trial court declined to award attorney fees against Respondent it ignored

the role of the prohibition against self-dealing in deterring breaches of trust duties.  But the trial court strictly applied this prohibition, requiring Respondent to pay for converted cattle and use of the trust property regardless of the court's determination that Respondent's actions were "born of a good faith." [10]  And we do not see that this strict liability applies to the accompanying attorney fees claim.  Indeed, our case law states the opposite and supports the conclusion of the trial court that "[t]he fact that the law imposes on a Trustee an obligation is not dispositive as to whether a trustee who breaches his duty is always liable to pay attorney fees."  *See Hughes v. Cafferty,* 2004 UT 22, ¶ 23, 89 P.3d 148 (stating that the lower court's determination that the only relevant issue to the award of attorney fees was whether recovery was " 'based on a violation of the trust' " was "inappropriately narrow inasmuch as it fails to recognize the broad discretion vested in courts of equity"); *id.* ¶ 29 n. 5 ("In most cases, ... equity will require that a trustee possess a degree of culpability greater than mere negligence before the trustee is held personally liable for attorney fees.").  Instead, "[i]n deciding whether to equitably award attorney fees, a court exercises its discretion and need not adhere to a rigid analysis."  *Id.* ¶ 31.  Under the facts of this case, we cannot say that the facts the trial court considered, including those facts bearing on whether there was a prevailing party, exhibited an abuse of discretion.

#### B.   Statutory Award of Attorney Fees

¶19 Respondent also argues that he should have been awarded his attorney fees.

---

8.  Petitioners argue that payment of these debts is beneficial to the property converter/renter.  This assertion, however, has no bearing on the issue before us.  Simply because the payment of property taxes and water assessments may be indirectly beneficial to the party in current possession of the property does not make the payment of those bills an obligation of the party in possession.

9.  The restatement referenced simply speaks to differing methods for measuring the liability of a breaching trustee.  *See* Restatement (Second) of Trusts § 205 (1959).  The restatement does not, however, state that offsets for trust obligations paid by the trustee are allowed when damages are measured in some ways but not in others.

10.  The trial court recognized, "[Respondent] has not acted or engaged in any conduct which approaches malicious or intentional conduct.  His conduct with respect to the cattle and rent was born of a good faith, albeit mistaken belief as to his rights and obligations with respect to the Trust."  Petitioners challenge this finding but do not marshal the evidence supporting the finding, including the evidence that Respondent sought legal advice regarding his obligations as trustee.  Accordingly, we presume the validity of the finding.  *See Moon v. Moon,* 1999 UT App 12, ¶ 24, 973 P.2d 431.

I believe that just as the trial court may strictly apply the prohibition against self-dealing without awarding Petitioners their attorney fees, *see supra* Part III.A, the court can also strictly apply the prohibition while awarding statutory attorney fees to Respondent. Utah Code section 75–7–1004 provides, "If a trustee defends or prosecutes *any* proceeding in good faith, whether successful or not, the trustee is entitled to receive from the trust the necessary expenses and disbursements, including reasonable attorney's fees, incurred." Utah Code Ann. § 75–7–1004(2) (Supp.2009) (emphasis added).[11]

¶ 20 Petitioners argue that allowing recovery from the trust for attorney fees spent by a trustee in defending an action for conversion of trust property would be an "incongruous result." However, section 75–7–1004 provides that reimbursement is allowed only when the trustee is defending in good faith and would, thus, prevent the unreasonable result that Petitioners fear.[12] *See id.* Furthermore, the statutory language at issue here would be meaningless if it did not apply to trustees being sued in their *individual* capacities and defending in good faith, because trustees being sued in their *representative* capacities are not personally liable for any judgment or attorney fees resulting from such litigation, *see* Restatement (Second) of Trusts § 261 cmt. 1 (1959).

¶ 21 Here, the trial court stated that "[w]here claims are grossly overstated, it is reasonable that a defense be made," thus indicating its finding that Respondent defended against Petitioners' claims in good faith. Also, Petitioners present no proper challenge to the trial court's good faith determination. We are not at liberty to change a statute and a trial court's factual determination simply because we may disagree with the legislature and the trial court. I believe that the statute not only makes sense, but means exactly what it says—it is applicable to *any* proceeding defended in good faith. My colleagues are apparently of the opinion that an exception is required when the proceeding involves self-dealing by the trustee. *See infra* ¶ 32. Yet there is absolutely no statutory language, case law,[13] or legislative history that would indicate such an interpretation. Thus, Respondent is entitled to receive reimbursement from the trust for the reasonable attorney fees incurred in his defense. I would therefore remand this issue to the trial court to award Respondent reimbursement of his reasonable attorney fees.

## IV. Prejudgment Interest

¶ 22 Respondent argues that the trial court erred by allowing prejudgment interest on the damages award. He argues both that the trust specifically limits his liability to the principal and income of the Trust, and that, alternatively, the damage calculations as they pertain to the cattle were not sufficiently definite to support an award of prejudgment interest on those damages.

### A. Limitation of Liability Clause

¶ 23 My colleagues would prefer not to reach the issue of whether the trust terms preclude an award of prejudgment interest. I, however, am convinced that the issue should be addressed because it is the only argument Respondent makes in his claim that prejudgment interest on *the rental damages* was not allowed. Thus, the issue of prejudgment interest on the rental damages remains entirely unaddressed by analyzing

---

11. Petitioners argue that this statute does not apply to this case because the conversion occurred before the effective date of the Utah Uniform Trust Code. *See* Utah Code Ann. § 75–7–1103(3) (Supp.2009) ("An act done before July 1, 2004 is not affected by this chapter."). However, the pertinent action discussed here is Respondent's defense, and the new legislation clearly applies because this case was initiated after the effective date. *See id.* § 75–7–1103(1) ("Except as otherwise provided, this chapter applies to ... all judicial proceedings concerning trusts commenced on or after July 1, 2004....").

12. Interestingly, the statutory language at issue here is not part of the Uniform Trust Code but was added by the legislature when it adopted the Uniform Trust Code. *Compare id.* § 75–7–1004, *with* Unif. Trust Code § 1004 (2000). Therefore, comparison with other states and their case law in analyzing this matter may be less than helpful.

13. The cases to which my colleagues cite in support of their interpretation are cases that preceded the adoption of the statute at issue here.

only the certainty of the damages calculations, which issue was argued and analyzed only with respect to the damages for cattle conversion.[14]

¶ 24 The Trust provides, "Any liability whatsoever, of any trustee, whether prior or present, shall be limited and confined to the principal and income of the Trust Estate itself." I believe that Respondent misreads this provision to prohibit any prejudgment interest on the damages awarded against him. Rather, this provision simply sets the total trust estate value as a cap on Respondent's liability. Therefore, because the amount Respondent is required to pay is significantly less than the total trust value, I believe that the trust provision would have no application in this case.[15]

## B. Certainty of Loss Calculations

¶ 25 "Prejudgment interest may be recovered where the damage is complete, the amount of the loss is fixed as of a particular time, and the loss is measurable by facts and figures." *Saleh v. Farmers Ins. Exch.*, 2006 UT 20, ¶ 28, 133 P.3d 428. We agree with Respondent that these last two requirements were not met in relation to the damages for cattle conversion.

¶ 26 First, as discussed above, the trial court could not ultimately determine a date when conversion occurred. *See supra* Part I.A. Indeed, even in specifically addressing the prejudgment interest issue, the trial court admitted that "the date [o]n which

[Respondent] converted the cows is unknown."[16] This does not fulfill the requirement that the amount of loss be fixed as of a particular time, *see Saleh*, 2006 UT 20, ¶ 28, 133 P.3d 428. Thus, it was error to award prejudgment interest running from May 8, 1995—the date of the allocation and a date where the fifty head of cattle were determined to still be part of the trust.

¶ 27 Second, the loss here was not measurable by facts and figures. The trial court expressed its frustration that there was not more direct evidence from which to value the cattle: "Based upon the evidence before the Court, the Court will value the 50 head at $550.00 a head, or $27,500.00. In doing so the Court must express some frustration with the fact that there was no direct evidence as to valuation in 1995." The trial court had some valuation evidence before it, estimated that the cattle would be older cattle, applied the value for seven- to eight-year-old cattle, and arrived at a damages award. Although we have determined that this evidence is sufficient to support the amount of damages awarded, *see supra* Part I.C., it is not sufficiently certain as to allow an award of prejudgment interest, *see Saleh*, 2006 UT 20, ¶ 28, 133 P.3d 428. Therefore, the trial court erred in awarding prejudgment interest on the damages for the cattle conversion, and we reverse such award.

## CONCLUSION

¶ 28 The trial court's factual findings regarding the cattle are not clearly erroneous,

---

14. Further, my colleagues indicate that they do not agree with my analysis in this section, *see infra* ¶ 33, which suggests that they believe that the limitation of liability clause *does* preclude prejudgment interest. Such would require a reversal on *all* prejudgment interest awarded, not simply the interest as it pertains to the cattle conversion damages, which is the only portion of prejudgment interest we reverse, *see infra* Part IV.B.

15. Petitioners argue that the provision would not be enforceable at any rate because it would, contrary to a statutory provision, reward Respondent for breaching the trust in bad faith. *See* Utah Code Ann. § 75–7–1008 (Supp.2009) ("A term of a trust relieving a trustee of liability for breach of trust is unenforceable to the extent that it . . . relieves the trustee of liability for breach of trust committed in bad faith or with reckless indifference to the purposes of the trust or the

interests of the beneficiaries. . . ."). However, in light of the finding that Respondent acted in good faith, *see supra* note 10, the referenced statutory provision would not trump the trust terms.

16. Although the trial court was aware that there was no fixed time of conversion, the court determined that Respondent should bear the burden of establishing when conversion took place because he was in the best position to do so. However, the one case on which the trial court placed its reliance was not controlling precedent and, more importantly, did not address prejudgment interest. *See Mitsui & Co. (USA) Inc. v. Hudson Tank Terminals Corp.*, 790 F.2d 226 (2d Cir.1986). We therefore think the case is insufficient to create an exception in this jurisdiction to the well established Utah rule that the loss must be fixed as of a particular time in order to support an award of prejudgment interest.

and we therefore affirm those findings. We also see no legal error with the trial court's award of a credit for property taxes and water assessments paid by Respondent. Moreover, the trial court did not abuse its discretion by denying Petitioners an equitable award of attorney fees or, in accordance with the concurring/dissenting opinion, in denying Respondents request for attorney fees under Utah Code section 75–7–1004. Similarly, the loss relating to the cattle was not fixed at a particular time or measurable by facts and figures, and we therefore reverse that portion of the prejudgment interest award.

THORNE, Judge (concurring in part and dissenting in part):

¶ 29 I concur with the analysis and conclusion in sections I and II of the lead opinion regarding conversion of the cattle and credit for payment of property taxes and water assessments, but I dissent with respect to the lead opinion's determination in section III that the trial court erred in denying attorney fees to Respondent. I also dissent from the lead opinion's consideration and analysis of the trust's limitation of liability clause in section IV.

¶ 30 Specifically, I disagree with the lead opinion's determination that Respondent is statutorily entitled to receive reimbursement for the reasonable attorney fees incurred in his defense because Respondent defended against Petitioner's claims in good faith. The litigation, in this instance, was caused by Respondent's acts of self-dealing. Indeed, the trial court found that Respondent used the trust lands for his farming operation without paying rent and converted fifty head of cattle. By so acting, Respondent violated his duty as trustee to the beneficiaries. Defense of such acts should not be chargeable against the estate. A trustee is required to administer the trust " 'solely in the interest of the beneficiary,' " *Wheeler v. Mann*, 763 P.2d 758, 760 (Utah 1988) (quoting Restatement (Second) of Trusts § 170 (1959)), and is not permitted to engage in self-dealing, *see id.* In the trustee context, "a trustee engages in self-dealing if he place[s] himself in a position where it would

be for his own benefit to violate his duty to the beneficiaries." *Eagar v. Burrows*, 2008 UT 42, ¶ 32, 191 P.3d 9 (alteration in original) (internal quotation marks omitted).

¶ 31 The lead opinion concludes that Respondent is entitled, pursuant to Utah Code section 75–7–1004(2), to reimbursement of reasonable attorney fees despite Respondent's self-dealing because the trial court indicated its conclusion that Respondent defended against Petitioner's claims in good faith when it stated "[w]here claims are grossly overstated, it is reasonable that a defense be made." *See supra* ¶ 21. I agree that section 75–7–1004(2) allows a trustee to recover reasonable attorney fees from the trust when defending against any proceeding in good faith, whether or not the defense is successful, *see* Utah Code Ann. § 75–7–1004(2) (Supp.2009), but I disagree that Respondent's defense was objectively in good faith. Furthermore, this proceeding alleged acts that benefitted Respondent personally, not merely actions affecting the trust. Although Respondent's self-dealing acts may, as the district court found, have been born of good faith and it may have been reasonable for Respondent to have raised a defense against "claims [that] are grossly overstated," that does not, however, mean that the entirety of Respondent's actions to defend himself against charges of self-dealing were reasonable or in good faith.

¶ 32 First, it should be noted that "[t]he prohibition against self-dealing does not depend upon proof of bad faith, but is absolute so as to avoid the possibility of fraud and the temptation of self-interest," *Wheeler*, 763 P.2d at 760. Respondent's actions, even if done in good faith, violated the prohibition against self-dealing, and reimbursement of reasonable attorney fees used to defend against self-dealing is not appropriate or allowed under Utah Code section 75–7–1004(2). *See* Utah Code Ann. § 75–7–1004(2). Second, the record demonstrates that Respondent's defense included a claim that there were no cattle in the estate and as such there had been no conversion. Respondent, by his self-dealing acts of conversion, made the litigation necessary. Certainly, such a defense is not consistent with a trustee's duty to

place the interests of the beneficiaries before his own. *See Wheeler*, 763 P.2d at 760 ("A trustee's duty of loyalty requires the trustee to administer the trust solely in the interest of the beneficiary." (internal quotation marks omitted)). Indeed, the trial court appears to have considered Respondent's role in necessitating the litigation when it stated, "Given all the circumstances in this case, no attorney fee will be awarded." An estate should not be charged with payment of attorney fees for services occasioned by a trustee's own self-dealing actions. *Cf. Webb v. Webb*, 250 Ala. 194, 33 So.2d 909, 927 (1948) ("But an estate should not be charged with payment of attorneys for services rendered the personal representative of a deceased executor, which services have been occasioned by the gross negligence, willful default and conversions of the deceased executor.").

¶ 33 Lastly, regarding prejudgment interest, I agree with the lead opinion that the loss relating to the cattle was not fixed at a particular time or measurable by facts and figures, and that the trial court erred in awarding prejudgment interest. However, I do not agree with the lead opinion's analysis of the trust's limitation of liability clause, and based on the determination that the trial court erred in awarding prejudgment interest, I do not believe it is necessary to consider the limitation of liability clause.

¶ 34 In sum, the litigation in this case was necessitated by Respondent's own self-dealing actions, the defense of which should not be charged against the estate. Accordingly, I would affirm the trial court's decision to deny attorney fees to Respondent. I also disagree with the lead opinion's consideration of the limitation of liability. I further believe that it is unnecessary in the context of this case.

¶ 35 I CONCUR: PAMELA T. GREENWOOD, Presiding Judge.